UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**DONELLE MOTEN,**

    **Plaintiff,**

    v.                                              Case No. 19-CV-908

**INSINKERATOR,**
**A Division of Emerson Electric Co.,**

    **Defendant.**

---

### DECISION AND ORDER ON DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

---

Donelle Moten sues his former employer, InSinkErator, a Division of Emerson Electric Co. ("ISE"), for retaliation and discrimination based on race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). ISE moves for summary judgment dismissing Moten's complaint. For the reasons explained below, ISE's motion is granted and this case is dismissed.

### UNDISPUTED FACTS

As an initial matter, I note that Moten, who is represented by counsel, failed to file a "concise response to the moving party's statement of facts" pursuant to Civil L. R. 56(b)(2)(B) (E.D. Wis.) or otherwise respond to ISE's motion for summary judgment. As such, ISE's proposed findings of fact will be deemed admitted for purposes of the motion. Civil L.R. 56(b)(4).

ISE produces instant hot water dispensers and food waste disposal systems, commonly known as garbage disposals. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 1, Docket #

1

49.) ISE operates four locations in Southeastern Wisconsin, with facilities in Kenosha, Mount Pleasant, Racine, and Sturtevant. (*Id.* ¶ 2.) The facilities are operated independently by different plant managers and different Human Resources departments. (*Id.* ¶ 3.)

ISE maintains an Hourly Wage Policy and compensates hourly employees based on this policy. (*Id.* ¶ 9.) There are a series of wage progression steps for each position, starting with "A," or the starting rate, and ending with "U," or the "maximum" or "top" rate. (*Id.* ¶ 10.) When ISE promotes or transfers an hourly employee to another pay grade, or to a different position within the same pay grade, the employee's rate of pay will be set back one progression step on the Hourly Wage Policy scale. (*Id.* ¶ 11.) This temporary change in pay is referred to as the "training rate" and is in place until the employee, in their supervisor's opinion, achieves—or makes satisfactory progress toward achieving—the production standard. (*Id.*)

Employees can apply for promotions and transfers to different positions at different ISE facilities through ISE's job posting process. (*Id.* ¶ 15.) The process is the same at each facility. (*Id.*) ISE posts available job openings on the facilities' main bulletin boards or department bulletin boards and provides the job title, department, pay grade, and shift. (*Id.* ¶¶ 15–16.) To apply for the position, employees must sign their names on the posting. (*Id.*) After the notice period for the posting closes, ISE grants the position to the qualified employee with the most seniority. (*Id.* ¶ 17.)

Employees at ISE work in either first, second, or third shifts (also known as "A," "B," or "C" shifts). (*Id.* ¶ 18.) First shift begins at 7:00 a.m. and ends at 3:00 p.m.; second shift begins at 3:00 p.m. and ends at 11:00 p.m.; and third shift begins at 11:00 p.m. and ends at 7:00 a.m. (*Id.*) ISE offers shift differentials for B shift and C shift: workers on B shift are offered

an extra forty cents per hour, while workers on C shift are offered an extra fifty cents per hour. (*Id.* ¶ 19.) Outside of the job posting process, ISE employees can use the shift preference process to change shifts once per year. (*Id.* ¶ 20.) Annually from March 1 to March 15, employees may submit a Shift Preference Request form to Human Resources identifying the shift to which they wish to move. (*Id.* ¶ 21.) Human Resources then reviews and publishes a list of shift preference requests that it received. (*Id.* ¶ 22.) Employees who no longer wish to move shifts may submit a Shift Preference Rescind notice between March 24 and March 31. (*Id.* ¶ 23.) Once the shift preference list is finalized, employees are notified of their approved shift preference and will be moved to their new shift around June 1. (*Id.* ¶ 24.)

Moten, an African American man, began working at ISE's Racine facility in 2000. (*Id.* ¶ 25; Docket # 1-5 at 3.) Moten was employed as a Packer at the Racine facility until 2016. (*Id.* ¶ 26.) Packers add various components to assembled disposal units, ensure the unit is in the correct carton, inspect the unit for damage, and dispose of non-conforming materials. (*Id.* ¶ 27.) On March 17, 2016, Moten voluntarily resigned from his employment with ISE. (*Id.* ¶ 28.) Moten filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against ISE in March 2016, claiming that his coworkers mistreated him and that he was subject to discrimination based on his race, gender, and disability. (*Id.* ¶¶ 91–92; Compl. ¶ 4, Docket # 1.)

On February 16, 2017, Moten entered into a settlement agreement that released all his actual and potential claims against ISE and allowed him to return to his full-time employment. (Compl. ¶¶ 4–6; DPFOF ¶ 94.) Jessica Tiefenthaler, one of ISE's representatives present at a mediation to resolve Moten's charge, believed that Moten would prefer work at ISE's facility in Kenosha because of his alleged mistreatment in Racine and breathing issues

3

that he had previously communicated to ISE. (DPFOF ¶¶ 4, 93, 95; Declaration of Jessica Tiefenthaler ¶ 21, Docket # 51.) Further, ISE had an opening in a Pack Cell position in Kenosha, which was similar to the Packer position that Moten had previously performed in Racine. (DPFOF ¶ 96.) Moten's then-wife encouraged him to accept placement at ISE's Kenosha facility because he would work with different people in a new setting. (*Id.* ¶ 97.) Prior to agreeing to return, Moten understood that he would be working at ISE's facility in Kenosha. (*Id.* ¶ 98.)

On February 27, 2017, Moten began working at ISE's Kenosha facility on second shift in the Pack Cell position, which consists of attaching cords, applying labels, and packaging finished units. (*Id.* ¶¶ 29–31.) On second shift, Moten reported to James Bednarek. (*Id.* ¶ 33.) Because the Pack Cell position was similar to the Packer position that Moten had previously performed to ISE's satisfaction in Racine, he was not placed on training pay. (*Id.* ¶ 34.) On March 21, 2017, Moten voluntarily transferred from second shift to first shift in the Pack Cell position through ISE's job posting process. (*Id.* ¶ 41.) He reported to Jennie Nilo and earned $20.67 per hour. (*Id.* ¶ 42.) On April 3, 2017, he received a pay increase to $21.87 per hour. (*Id.* ¶ 43.)

During the time that Moten worked in Kenosha, he saw an image in the men's bathroom that depicted a monkey evolving into an overweight Caucasian male holding a soda. (*Id.* ¶ 36.) The image did not directly reference or identify Moten. (*Id.* ¶ 38.) Moten testified that he took a picture of the image "as soon as he saw it," on October 14, 2017. (Declaration of Jesse Dill ("Dill Decl.") ¶ 2, Ex. A, Deposition of Donelle Moten ("Moten Dep.") at 213.) Moten does not know who posted the image, and it was gone two or three days later when he next used the men's bathroom. (DPFOF ¶¶ 37, 39.) Moten also observed

4

an image of monkeys on a computer while employed at ISE's Kenosha facility, although he does not know on whose computer the images were located. (*Id.* ¶¶ 51–52.) These images were not directed at Moten. (*Id.* ¶ 53.) Moten did not report either the image in the bathroom or the computer screen images to any manager or supervisor at ISE at the time he viewed them. (*Id.* ¶¶ 40, 54.) Moten also alleges he was denied a Floater position three times at ISE but cannot remember any details concerning the first or third time. (*Id.* ¶ 49.) He estimates that the second time was in June or July 2017. (*Id.*) ISE has no record that Moten signed for any Floater positions in June or July of 2017. (*Id.* ¶ 50.)

In November 2017, Moten signed a job posting to transfer to ISE's Racine facility in the Auto Pack Alternate position. (*Id.* ¶ 56.) Moten accepted the position on or about November 8, 2017 and transferred effective November 13, 2017. (*Id.* ¶ 57.) An Auto Pack Alternate replaces personnel in the department when they are absent, on vacation, or on leave. (*Id.* ¶ 58.) Auto Pack Alternates perform various tasks, including making the disposal unit box, putting rings and plumbing in the unit, conducting inspection and trim functions, and putting the unit in the box. (*Id.*) For the inspection and trim functions of the job, an Auto Pack Alternate needs to apply spec plates and decals on specific units. (*Id.* ¶ 59.) The decal contains a small serial number, which the Auto Pack Alternate must read and put in a log. (*Id.*) Moten needed to wear personal protective equipment, including gloves, ear plugs, steel-toed boots, and safety glasses to perform the position. (*Id.* ¶ 60.)

As an Auto Pack Alternate, Moten worked on second shift and reported to James Bednarek. (*Id.* ¶ 62.) He earned $21.23 per hour. (*Id.* ¶ 63.) Upon his transfer to the position, ISE placed Moten on training rate. (*Id.* ¶ 64.) Therefore, his rate of pay was set back one progression step, pursuant to ISE's policy. (*Id.*) Bednarek, as Moten's supervisor, was

5

Case 2:19-cv-00908-NJ   Filed 06/09/21   Page 5 of 16   Document 59

responsible for the decision as to whether Moten could earn top rate as an Auto Pack Alternate. (*Id.* ¶ 65.) Moten could not perform all the tasks that Auto Pack Alternates were required to complete; specifically, he could not apply the spec plates to the units. (*Id.* ¶ 66.) Moten could not do so because he did not have prescription safety glasses to read the small print on the spec plates and labels. (*Id.* ¶ 67.) For the duration of time that Moten was an Auto Pack Alternate, he did not obtain prescription safety glasses and could not perform the inspection and trim function of his position. (*Id.*)

Bednarek kept Moten on training pay due to his inability to complete the spec and decal tasks. (*Id.* ¶ 70.) Moten received a "Safety Eyewear Purchase Authorization" form at ISE, which employees can use to obtain prescription safety glasses for no cost. (*Id.* ¶¶ 68–69.) Bednarek advised Moten to obtain prescription safety glasses and anticipated moving him to top rate once he received his prescription safety glasses and could perform the spec and decal tasks. (*Id.* ¶¶ 71–72.) Although Moten believed a "Charlie from Denver" and Reggie Pitt were two employees who were taken off training pay after two weeks, Moten does not have any first-hand knowledge or evidence that these two individuals were removed from training pay but were unable to perform their respective positions. (*Id.* ¶ 73.)

Moten met with Chad Severson, president of ISE from March 2016 to December 2018, on two occasions at ISE's Racine facility. (*Id.* ¶¶ 74–75.) The first meeting was in March 2018, at the earliest. (*Id.* ¶ 76.) During this meeting, Moten showed Severson the image he found in the bathroom in Kenosha. (*Id.* ¶ 77.) Severson responded, "That's evolution." (*Id.*) Moten testified that he also discussed his status on training pay with Severson at this meeting. (Moten Dep. at 196.) Moten had a brief discussion with Severson during his employment at the Kenosha facility, but he did not discuss any of his employment issues at that time. (*Id.* ¶ 78.)

6

Case 2:19-cv-00908-NJ    Filed 06/09/21    Page 6 of 16    Document 59

Severson did not take any negative actions toward Moten after any meeting they had. (*Id.* ¶ 79.) Moten did not speak to anyone at ISE's Racine or Kenosha facilities about his meetings with Severson. (*Id.* ¶ 80.)

On March 15, 2018, Moten voluntarily signed and submitted a shift transfer form to request to be moved to "C shift," or third shift. (*Id.* ¶ 82.) Moten never worked a shift at ISE's Kenosha or Racine facilities that he did not want to work. (*Id.* ¶ 83.) On May 30, 2018, Moten accepted a position as Packer at ISE's Racine facility; effective June 4, 2018, he transferred to the position. (*Id.* ¶ 84.) As a Packer on third shift, Moten reported to Tom Brehm and earned $22.50 per hour. (*Id.* ¶¶ 85–86.) Moten did not require prescription safety glasses to perform his job duties as a Packer, and ISE restored Moten to top rate pay when he transferred to the position. (*Id.* ¶¶ 87–88.) Moten had no issues with how his supervisor or coworkers treated him while he reported to Brehm. (*Id.* ¶ 89.)

On October 17, 2018, Moten filed an EEOC charge against ISE. (DPFOF ¶ 102; Docket # 1-5 at 3.) In the charge, Moten alleged that after he returned to ISE in February 2017, he was denied training; given training pay for eight to nine months; subjected to harassment, including seeing pictures of monkeys on employee computers and monkey-to-man evolution posters; and discriminated against based on his color, race, religion, disability, and in retaliation for engaging in protected activity. (Docket # 1-5 at 3.) Moten received a right to sue notice on April 11, 2019. (Docket # 1-5 at 5.) He subsequently filed this lawsuit against ISE on June 20, 2019. (Compl.)

Moten did not inform any employee, supervisor, or manager at ISE of his March 2016 EEOC charge or settlement agreement. (*Id.* ¶ 99.) Moreover, Jessica Tiefenthaler did not advise James Bednarek, Jennie Nilo, or Tom Brehm of Moten's EEOC charge or settlement

7

agreement. (*Id.* ¶ 100.) No supervisor or management employee ever referenced Moten's EEOC charge or settlement agreement to him. (*Id.* ¶ 101.) ISE never disciplined Moten during his employment. (*Id.* ¶ 90.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d

410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Moten's complaint sets forth various alleged retaliatory and discriminatory incidents that occurred after he returned to ISE in February 2017. (Compl. ¶ 6.) ISE argues that several of Moten's claims are untimely and that all of them fail as a matter of law. (Def.'s Br., Docket # 48.)

 1. *Untimely Claims*

As an initial matter, ISE argues that Moten's Title VII claims arising out of his Kenosha employment are time-barred. (Def.'s Br. at 9.) Before bringing a Title VII action in federal court, a plaintiff must file a charge with a federal or state equal rights agency within 300 days after the alleged unlawful act. *See* 42 U.S.C. § 2000e-5(e); *Johnson v. J.B. Hunt Transp., Inc.*, 280 F.3d 1125, 1128–29 (7th Cir. 2002). "If a plaintiff does not file a charge concerning a discrete act of discriminatory conduct within 300 days of its occurrence, his claim is time-barred and he may not recover." *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007). Discrete acts include, for example, "termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

Moten filed his EEOC charge on October 17, 2018. (Docket # 1-5 at 3.) As a result, Moten cannot assert Title VII claims based on discrete acts that occurred before December 21, 2017 (300 days before October 17, 2018). Moten's allegations include that ISE retaliated and discriminated against him by assigning him to the Kenosha facility even though he lived in Racine, failing to train him for the Pack Cell position, and denying him for a Floater position on three separate occasions. (Compl. ¶ 6.) Moten started his job in the Pack Cell

position at the Kenosha facility on February 27, 2017. (DPFOF ¶ 29.) He subsequently transferred to the Auto Pack Alternate position in Racine effective November 13, 2017. (*Id.* ¶ 57.) Further, Moten testified that he was first denied a Floater position in 2016, denied again in either June or July 2017, and denied a third time that he could not remember. (Moten Dep. at 166–67.) These alleged incidents occurred before December 21, 2017.

Moten's complaint also references the monkey-to-man evolution image he observed in the men's bathroom at ISE's Kenosha facility. (Compl. ¶ 6(f).) Moten testified that he saw the image on October 14, 2017 and it was gone two or three days later. (Moten Dep. at 213–14.) Moten further claims that ISE retaliated and discriminated against him when a co-worker "placed monkeys on the computer, a negative reference to African-Americans," at the Kenosha facility in 2018 and ISE did not investigate or impose discipline for the images. (Compl. ¶ 6(f).) However, Moten transferred to a position at ISE's Racine facility in November 2017 and remained in Racine until his last day of physical work on October 16, 2018. (DPFOF ¶ 57; Moten Dep. at 121, 159, 245.) Accordingly, this too predates December 21, 2017.

Because Moten alleges discrete acts that occurred prior to December 21, 2017, his Title VII claims based on these incidents are time-barred.

    2.    *Retaliation*

Moten alleges that ISE retaliated against him for filing his March 2016 EEOC charge by keeping him on trainee pay for nine months when he transferred to the Auto Pack Alternate position and by assigning him to third shift in May 2018. Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because he has opposed a practice made unlawful by Title VII or has "made a charge, testified, assisted, or participated

10

Case 2:19-cv-00908-NJ   Filed 06/09/21   Page 10 of 16   Document 59

in" a Title VII investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, Moten must demonstrate that: (1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) that there is a causal link between the protected activity and the adverse action. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). For purposes of a Title VII retaliation claim, an action is materially adverse if "a reasonable employee . . . would be dissuaded from engaging in the protected activity." *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Further, an employee must experience "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (citations and quotations omitted).

Again, Moten asserts that he was "forced to take a trainee status" for nine months when he transferred to the Auto Pack Alternate position, which resulted in missed overtime and a loss of $10,000 in pay. (Compl. ¶ 6(c).) ISE does not contend that Moten did not suffer a materially adverse action; rather, it asserts that Moten has not demonstrated a causal connection between his training pay placement and any protected activity. (Def.'s Br. at 17.) To prove causation, Moten must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Robinson*, 894 F.3d at 830 (citations omitted).

James Bednarek, Moten's supervisor for the Auto Pack Alternate position, determined whether Moten could be removed from training rate. (DPFOF ¶ 65.) Nothing in the record suggests that Bednarek was aware of Moten's first EEOC charge. Specifically, it is undisputed that neither Moten nor Jessica Tiefenthaler informed Bednarek about Moten's charge or settlement agreement with ISE, and no supervisor or management employee ever referenced either to Moten. (DPFOF ¶ 99, 100–01.) At most, Moten testified that after he met with

11

Severson, Bednarek said to him: "I heard you talked to Chad." (Moten Dep. at 204.) But this single statement is insufficient for a rational fact finder to conclude that Bednarek knew the content of Moten's meeting with Severson and then retaliated against Moten for filing the EEOC charge by keeping him on training pay. As Moten himself testified, he never discussed with anyone what he spoke to Severson about. (Moten Dep. at 205.) On this record, Moten has produced no evidence that his filing of an EEOC charge caused him to remain on training pay. Accordingly, he cannot establish a *prima facie* case of retaliation.

Even if Moten could meet his *prima facie* burden, ISE has presented a non-retaliatory reason for Moten's nine-month placement on training rate pay: his inability to perform certain functions of the Auto Pack Alternate position. It is undisputed that Bednarek kept Moten on training rate due to his inability to perform the spec and decal tasks, and that Moten never obtained the prescription safety glasses he needed to do so. (DPFOF ¶¶ 67, 70.) Moten has put forth no evidence that ISE's proffered reason for his nine-month placement on training pay was pretext for retaliation.

Moten also alleges that his assignment to third shift on May 8, 2018, given his seniority of 17 years, "imposed undue hardships in terms of sleep, peace of mind, and energy." (Compl. ¶ 6(e).) As an initial matter, Moten's reference to an assignment on May 8, 2018 is unclear. Moten testified that he completed a shift preference request form on March 15, 2018 (Moten Dep. at 251) and it is undisputed that he accepted a transfer to a Packer position in Racine on third shift on May 30, 2018 (DPFOF ¶ 84). As to the substance of Moten's claim, ISE notes that Moten admitted in his deposition that he never worked a shift that he did not want to work, and as such, Moten no longer alleges claims the shift assignment was an adverse action. (Def.'s Br. at 17.) Moten indeed testified he had no complaints about going to third shift.

(Moten Dep. at 248.) This testimony suggests that Moten was not subject to an adverse action at all.

Further, there is no evidence that Moten's placement on third shift was materially adverse. Generally, an employee's shift change is not considered materially adverse unless "the change results in a change in pay or prestige or is particularly harmful to that employee." *Koty v. DuPage Cty., Illinois*, 900 F.3d 515, 521 (7th Cir. 2018). Upon his transfer to third shift, Moten's pay increased from $21.23 to $22.50 per hour. (DPFOF ¶¶ 63, 86.) Further, Moten has not put forth evidence of any "unique circumstances" which suggest that a change to third shift was particularly harmful to him. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). As such, there is no need to determine whether any protected activity of Moten's caused his shift transfer. For these reasons, ISE is entitled to summary judgment on Moten's retaliation claim.

   3.   *Discrimination*

Moten also alleges that ISE discriminated against him based on his race by keeping him on trainee pay for nine months when he transferred to the Auto Pack Alternate position and by assigning him to third shift in May 2018. Title VII makes it unlawful for an employer to discriminate against any individual "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on his discrimination claim, Moten must submit evidence that would permit a reasonable factfinder to conclude that his race caused an adverse employment action. *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* "For an employment action to be actionable, it must be a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007).

While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. *Ortiz*, 834 F.3d at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Moten has the initial burden of establishing that (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If Moten satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Moten to submit evidence that the employer's explanation is pretextual. *Id.*

ISE argues that Moten's claim of discrimination based on training pay fails because there is no evidence of a similarly situated employee outside of Moten's protected class that ISE treated more favorably. (Def.'s Br. at 21.) To qualify as similarly situated, a fellow employee must be "directly comparable to the plaintiff in all material respects." *Walker v. Bd. of Regents of the Univ. of Wis. Sys.*, 410 F.3d 387, 396 (7th Cir. 2005). The question of whether a comparator is similarly situated is "typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018). Generally, a plaintiff must show that the other employee: "1) dealt with

14

the same supervisor; 2) was subject to the same standards; and 3) engaged in similar conduct." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008).

Moten testified that "Charlie from Denver" and Reggie Pitt were two employees who were taken off training pay after two weeks. (Moten Dep. at 242, 243.) However, Moten puts forth very little information regarding these two supposed comparators. First, Moten does not allege that either "Charlie from Denver" or Reggie Pitt were outside of Moten's protected class. Second, Moten puts forth no evidence that either alleged comparator engaged in similar conduct. As to "Charlie from Denver," Moten testified that he did not know if Charlie was unable to perform the functions of the Auto Pack Alternate position when he was taken off training pay. (*Id.* at 243.) Similarly, as to Reggie Pitt, the record contains no evidence—aside from Moten's personal assessment of Pitt's abilities—that Pitt was unable to perform the packing function of the Auto Pack Alternate job when he was taken off training pay. (*Id.* at 243–44.) Based on this evidence, no reasonable fact finder could conclude that ISE treated a similarly situated employee outside of Moten's protected class more favorably. Furthermore, even if Moten could meet his *prima facie* burden, Moten has not demonstrated that ISE's reason for keeping him on training pay—his inability to perform all of the functions of the Auto Pack Alternate position—was pretext for discrimination.

Finally, as with Moten's retaliation claim, there is no evidence that Moten's assignment to third shift was a materially adverse employment action taken because of his race. Mere speculation is insufficient to defeat summary judgment. For these reasons, ISE is entitled to summary judgment on Moten's discrimination claim.

## CONCLUSION

Moten alleges that ISE took various retaliatory and discriminatory actions against him. However, Moten did not respond to ISE's motion for summary judgment and has put forth no evidence to support his claims. No rational trier of fact could find in Moten's favor. Therefore, ISE's motion for summary judgment is granted. This case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 47) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of June, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge